MAXWELL v. SPRINGFIELD FIRE AND MARINE
INSURANCE COMPANY.

[No. 10,020. Filed January 16, 1920. Rehearing denied April
2, 1920. Transfer denied April 20, 1920.]

1. INSURANCE.— Policies.— Construction of Ambiguities. — For
the purpose of construction an insurance policy is not regarded
as an ordinary contract, ambiguities in its language being
resolved in favor of the insured.   p. 255.

2. INSURANCE.—Policies.—Clauses Exempting from Liability.—
Exemptions from the general obligation of the insurer under
a policy of insurance should be expressed in plain language
of sufficient clearness that persons of average intelligence may
comprehend its meaning.   p. 263.

3. INSURANCE.—Sprinkler Leakage Insurance.—Tornado Clause.
—Construction.—A clause in a policy insuring against all
direct loss by sprinkler leakage except as provided in the
policy, providing that the insurer shall not be liable for loss
caused by "lightning (whether fire ensues or not), cyclone,
tornado, windstorm," does not exempt the insurer from loss
by leakage caused by injury to the sprinkler system by tornado.
p. 265.

4. PLEADING.—Demurrer.—Searching the Record.—Requirement
of Memorandum.—Since the adoption of §344 Burns 1914, Acts
1911 p. 415, rendered doubtful the availability of the rule that
a demurrer to an answer searches the complaint, a ruling
upon a demurrer to the answer, overruling it to a bad an-
swer and sustaining it to a good complaint, will be reversed
in its entirety, with directions to the lower court to sustain
the demurrer as to the answer and to permit further pro-
ceedings not inconsistent with the opinion of the Appellate
Court.   p. 266.

From Rush Circuit Court; Will M. Sparks, Judge.

Action by Lawrence Maxwell against the Springfield

Fire and Marine Insurance Company. From a judgment for defendant, the plaintiff appeals. *Reversed.*

*D. W. McKee, Allen Wiles* and *Richard N. Elliott,* for appellant.

*Thomas Bates, Alfred R. Bates* and *Burke G. Slaymaker,* for appellee.

Statement by DAUSMAN, J.—This action was instituted by appellant to recover on two policies of insurance. The complaint is in two paragraphs and was filed in the Fayette Circuit Court. The appellee demurred to each paragraph of the complaint on the ground that neither paragraph states facts sufficient to constitute a cause of action. The demurrers were overruled. Thereupon appellee filed answers as follows: (1) General denial; (2) special answer addressed to the first paragraph of complaint; and (3) special answer addressed to the second paragraph of complaint. Immediately after filing its answers the appellee took a change of venue and the cause was transferred to the Rush Circuit Court. In the latter court appellant filed separate demurrers to the second and third paragraphs of answer on the ground that neither paragraph stated facts sufficient to constitute a cause of defense. The trial court overruled the demurrer to each paragraph of answer and then carried the demurrers back and sustained one to each paragraph of the complaint. Appellant declined to plead further. Judgment against appellant.

The following is the substance of the first paragraph of the complaint:

"That the plaintiff, Lawrence Maxwell, is the owner of a factory in the City of Connersville; that the defendant is an incorporated company carrying on the business of insuring owners of property against damages from sprinkler leakage; that plaintiff's factory was equipped with sprinklers for the purpose of protecting

the property from damage or destruction by fire; that the plaintiff and defendant entered into a written agreement, by the terms of which the defendant insured the plaintiff against damage from sprinkler leakage for the term of one year, a copy of which contract is filed herewith and made a part hereof as Exhibit A; that on the 25th day of April, 1915, a severe windstorm, cyclone or tornado swept over said city where said factory was located; that said storm tore a large part of the roof from that portion of the factory which is situated on the east side of Eastern Avenue, and broke the pipes and attachments of the sprinkler system in the factory so that the water and mud from the sprinkler pipes was precipitated and thrown in and upon the floors and upon the finished and unfinished products, stock, materials and machinery in the building, thereby damaging the plaintiff in the sum of $21,500; that all of said damage was directly caused by said sprinkler leakage and the precipitation of water from the pipes of the sprinkler system and not otherwise.

"That the plaintiff has fully performed all of the obligations resting upon him under the terms of the said contract; that the defendant has wholly failed, neglected and refused to make payment whatever under said policy of insurance for said loss and damages; that the defendant disclaims liability under said policy; that plaintiff is informed and believes, and therefore avers, that the defendant claims that it is in no way liable for said damage and loss because the same was indirectly caused and occasioned by the storm; and the plaintiff avers that said sprinkler leakage was the direct and proximate cause of all of said damage and loss."

So much of the policy as is necessary to an understanding of the question presented is as follows:

"The Springfield Fire & Marine Insurance Company of Springfield, Massachusetts, in considera-

tion of the terms and stipulations herein named and of $46.80 premium, does insure Lawrence Maxwell for the term of one year  *  *  *  against all direct loss or damage by sprinkler leakage, except as hereinafter provided, to an amount not exceeding Six Thousand Five Hundred Dollars, to the following described property while located and contained as described herein and not elsewhere, to wit:

"On all property, real and personal, owned by the insured, and on contents, their own or held by them in trust or on commission, which may be sold but not removed, or for which they may be legally liable, all while situate on both sides of Eastern Avenue between First and Second Streets, Connersville, Indiana.

"Subject to the conditions of this policy, it is agreed when a tank is or tanks are actually supplying water to the sprinkler system mentioned herein, that this policy shall cover loss or damage resulting from the collapse or precipitation of said tank or tanks or by the component parts of supports of same, such loss or damage being considered as incidental to and part of the damage caused by water. Attached to and forming a part of Sprinkler Leakage Policy No. 1800.

"Wherever the word 'sprinkler-leakage' occurs, it shall be held to mean leakage, discharge, or precipitation of water from the automatic sprinkling system or tanks supplying it (including accident caused by freezing), in or on the buildings now erected and described herein, whether the accident occurs in the portion occupied by the insured or not.

"This Company shall not be liable (1) for loss by fire, however caused; (2) nor for loss resulting from the leakage of water, if such leakage is caused directly or indirectly by fire; (3) nor for loss due to stoppage or interruption of any work or plant unless liability for such loss is specifically assumed herein; (4) nor for loss caused by lightning (whether fire ensues or not), cyclone, tornado, windstorm, earthquake, explosion, or blasting; (5) nor for loss caused directly or indirectly by invasion or insurrection, riot, civil war or commotion, or military or usurped power, or by order of any civil authority; (6) nor for loss by theft; (7) nor for loss caused directly or indirectly by the neglect

of the insured to use all reasonable means at the time of an accident to save and preserve the property; (8) nor for loss caused directly or indirectly by the fall or collapse of any building or part thereof, unless such fall or collapse is caused by the accidental leakage of water from the automatic sprinkler system or the tanks supplying it."

The affirmative paragraph of answer addressed to the first paragraph of complaint recites some of the terms and conditions of the policy, states the company's construction of the contract, and concludes:

"Defendant further says that the said loss and damage sued for in the said first paragraph of complaint herein was caused by windstorm and by sprinkler leakage caused directly, proximately and immediately by a windstorm then and theretofore occurring and not otherwise, and that the said damage sued for in the complaint and all thereof was caused wholly by a means and cause and by the aforesaid means and cause excepted by said policy by the terms thereof excluded therefrom and by a cause not insured by said policy."

The second paragraph of complaint is the same as the first, except that it is founded on a different policy. The affirmative paragraph of answer addressed to the second paragraph of complaint is the same as the affirmative paragraph of answer addressed to the first paragraph of complaint.

---

DAUSMAN, J. (after making the foregoing statement)—

For the purpose of construction, an insurance policy is not regarded as an ordinary contract; and, where the language of the policy is ambiguous, that construction will be adopted which is most favorable to the insured. Glens Falls Ins. Co. v. Michael (1907), 167 Ind. 659, 74 N. E. 964, 79 N. E. 905, 8 L. R. A. (N. S.) 708; Aetna Ins. Co. v. Strout (1896), 16 Ind. App. 160, 44 N. E. 934; German Baptist, etc.,

*Assn.* v. *Conner* (1917), 64 Ind. App. 293, 115 N. E. 804.

The reason for the rule has been stated cogently by Judge Taft, as follows: "Policies are drawn by the legal advisers of the company, who study with care the decisions of the courts, and, with those in mind, attempt to limit as narrowly as possible the scope of the insurance. It is only a fair rule, therefore, which courts have adopted, to resolve any doubt or ambiguity in favor of the insured and against the insurer." *Manufacturers' Accident, etc., Co.* v. *Dorgan* (1893), 58 Fed. 945, 7 C. C. A. 592, 22 L. R. A. 620.

It is averred in the complaint that the loss for which appellant seeks recovery was caused directly by the leakage from the sprinkler system. The general obligation of the insurer is to pay indemnity for "all direct loss or damage by sprinkler leakage, except as hereinafter provided." Under that general obligation the insurer is liable for the loss averred in the complaint, unless it has absolved itself by the exceptions stated in the contract. We will examine, therefore, the entire policy to determine from the language thereof, if we can, the real intention of the parties as expressed by the contract.

The insured installed in his factory an automatic sprinkler system to lessen the fire hazard. That was commendable from every point of view; for thereby he promoted his own interests as well as the interests of the insurance companies underwriting the fire risk. However, by installing the automatic sprinkler system he introduced into his factory a new hazard. In several ways and by various means the sprinkler system might be opened, thereby releasing the impounded water. In that event, damage by water probably would result to the building, machinery, goods manufactured and in process of manufacture, materials and supplies. It was

indemnity against this particular hazard which the insured desired and for which he paid; and in consideration of the premium, the insurer, by its contract, undertook to indemnify him against all *direct* loss by sprinkler leakage, except as therein otherwise provided. The paragraph containing the exceptions consists of eight clauses which must now be scrutinized.

(1) "This company shall not be liable for loss by fire, however caused;"

On first view this clause seems to be utterly useless. But the presumption is that every statement in a contract was inserted for a purpose; and that presumption will prevail if any rational purpose can be discovered. The contract is not a policy of fire insurance; but the insurer is a fire insurance company, as the policy itself denotes, and presumably it is engaged in the business of fire insurance. For this reason the company may have deemed it prudent to state clearly that by this policy it assumes no liability for loss by fire, no matter how the fire may have been caused. Thereby it avoids any misunderstanding or controversy concerning liability for loss by fire.

This clause does not constitute an exception; it takes nothing out of the obligation to pay indemnity for loss by sprinkler leakage; it does not hold back or exclude from that obligation something which otherwise would be included therein; and clearly it is an independent statement of a collateral matter, unless it relates to fire. following sprinkler leakage.

(2) "nor for loss resulting from the leakage of water, if such leakage is caused directly or indirectly by fire;"

Automatic sprinkler systems are so contrived and constructed that in the event of fire, when the heat has reached a certain degree of intensity, it opens the.

sprinklers and releases the water; and in that case the leakage is, of course, caused directly by fire. We assume that there may be cases where sprinkler leakage is caused indirectly by fire; for the company was careful to say that it will not be liable for loss by leakage if the leakage is caused indirectly by fire. To insure against loss by leakage where the leakage is caused directly or indirectly by fire would be to insure against loss by the very thing which the sprinkler system is designed to do. While that hazard would be a legitimate subject of insurance, it is to be presumed that, if included in the policy, the certainty of loss thereby in the event of fire would call for a higher rate of premium. By this clause the company has eliminated most of the risk. But the meaning of this clause is clear, and there can be no controversy concerning its meaning. This clause is a genuine exception, clearly and admirably expressed.

When clauses one and two are considered together, the thought arises that both may have been inserted partly to avoid invading the province of fire insurance; for, if leakage were caused by fire, the direct loss by leakage would be a loss by fire within the meaning of fire policies, and that fact might generate disputes concerning concurrent liability with fire insurance companies.

(3) "nor for loss due to stoppage or interruption of any work or plant unless liability for such loss is specifically assumed herein;"

This clause naturally must relate to a situation where leakage occurs to such an extent and under such conditions that it thereby becomes necessary for the insured to suspend operations in part or all of his factory for such period of time as may be required for repairs and readjustments. When interpreting the words of an insurance policy which are claimed to constitute an excep-

Maxwell *v.* Springfield, etc., Ins. Co.—73 Ind. App. 251.

tion from the general obligation to pay indemnity, the mind naturally rests on the conditions which probably will follow the happening of the contingency constituting the hazard insured against, and it will be presumed that those conditions were in contemplation when the policy was formulated and delivered; for there can be no loss, of course, until that contingency has occurred. In the very nature of things there must be a wide difference between the manner of stating an exception which relates to conditions before the happening of the contingency and the manner of stating an exception which relates to conditions after the happening of the contingency. The former is in the realm of causation; the latter in the realm of effect. The cause of loss is necessarily specified in the obligation itself; and, if the insurer desires to go back of that and deal with the causes of a cause, it must do so by clear and unequivocal words. In the case at bar the cause of loss for which indemnity is promised is designated "sprinkler leakage." The insured therefore would be liable, in the absence of a proper exception, for all loss which results naturally and directly from that cause. We assume that the clause now under consideration was inserted out of a superabundance of precaution to make it clear that any loss by stoppage of work should be regarded as too remote to figure in the loss by leakage. At any rate, it cannot be permitted to bear the meaning that there shall be no liability for loss by leakage where the leakage is due to stoppage or interruption of work. It may be said that this interpretation is farfetched. But, however, that may be, it is certain that we would have to travel a longer road to carry it back into the realm of causation. To do that we would be obliged to draw upon our imagination for what has been omitted, and then to read into the policy, by way of implication, something like this: "If there should be a stoppage or inter-

ruption of any work or plant and the premises should remain idle for a time, and if during the period of idleness a leakage should occur by reason of any cause arising out of the nonactivity, then and in that event the insurer shall not be liable for the loss resulting from the leakage." It may be that leakage is more likely to occur when work in a factory is suspended, and that the stoppage of work augments the hazard unless the premises be constantly under the surveillance of a caretaker. If that be true, and if by this clause the insurer is aiming at that feature, it should have made its purpose clear by the use of unambiguous language.

(4) "nor for loss caused by lightning (whether fire ensues or not), cyclone, tornado, wind-storm, earthquake, explosion, or blasting;"

The parenthetical words in this clause have a marked significance. At first view one is prompted to say that it would have been more appropriate to have written "(whether leakage ensues or not)." But, if the company had meant that, undoubtedly it would have so written it. Having in its service insurance experts and skilled draftsmen, its self-interest would not have permitted a blunder of that kind. We assume that the company knew what it wanted in its policy; and although we are not aware of the real purpose of the parenthetical words, we presume that they have an important significance which is well known to the company. We note, however, that if lightning should strike the factory and thereupon and thereby fire should ensue, and the heat generated by the fire should open the sprinklers, then, by reason of the absolution provided by clause two the company would not be liable for the loss by leakage. If lightning should strike the factory and knock down the chimney, no other damage resulting, it is clear that the company would not be liable; for that would be a direct loss by lightning within the

generally accepted meaning of the words "loss by lightning." But if the lightning should knock down the chimney and also break a pipe of the sprinkler system, thereby causing loss by leakage, then the company would not be liable for the direct damage by lightning to the chimney and the water pipe, but would be liable for any loss by leakage caused indirectly by the lightning; for the loss by leakage is the very thing for which indemnity is promised and for which the premium is paid. The company could escape that liability only by an exception in unequivocal language. We cannot read into the policy an exception of that character by way of construction. To absolve an insurer from its general obligation to pay indemnity, the exception must be expressed in the policy by unequivocal words. By this clause the company has absolved itself from liability for direct loss by lightning, but not from loss by sprinkler leakage where the leakage is caused by lightning.

The windstorm tore away a part of the roof of the factory and broke the pipes and connections of the sprinkler system, and that constitutes a loss by windstorm. The extent of that loss could be ascertained by estimating the cost of restoring the roof, the pipes and connections. But the damage to the merchandise caused directly by the water from the sprinkler system is an entirely different loss. For the purposes of this policy, the wind cannot be regarded as the direct and immediate cause of that loss, but must be regarded as the indirect and remote cause thereof, for the reason that the very hazard which makes this species of insurance possible intervened.

Why, then, was clause four inserted in the policy? That is not a fair question to put to the court. We are not called upon to determine the exact purpose which prompted the company to write it into the contract. It is enough for us to know the legal effect of it as be-

tween the parties. The question is important only to the extent that it may aid in arriving at the proper construction of the contract as a whole. It may relate specially to the risk specifically attaching to the tank. We do not know the location of the tank; but we assume that it is higher than the factory, so that a constant pressure would be maintained in the pipes. It may be supported by trestle or derrick, or it may be on the roof of the factory building. It is probable that by reason of its elevated position and the nature of its support it is peculiarly liable to collapse or fall by the force of a cyclone or a tornado, a windstorm, an earthquake, an explosion, or of blasting. This clause may have been inserted to avoid possible dispute and litigation by forstalling any unreasonable demand which the insured might make in the event of loss. It may have been inserted to make it clear that in the event of loss by leakage concurrently with loss by one of the forces named therein then the insurer shall not be liable for the combined loss resulting from both causes, but liable only for that portion of the total loss which results directly from the leakage. Or, it may have been inserted for the same reason that clause one was inserted, as above suggested, viz., to avoid invading the special domain of companies engaged in other kinds of insurance, particularly cyclone or tornado insurance. It is not an exception from the general obligation, but is an independent statement of collateral matters.

(6) "nor for loss by theft;"

This clause indicates that the insurer contemplated that in the event of accidental sprinkler leakage the insured might cause some of his goods to be removed from the building to prevent as much damage by water as possible; that by reason of the ensuing excitement and disarrangement, thieves might take advantage of the opportunity to steal and carry away some of the goods;

and that the loss by theft under such circumstances might be regarded as a direct loss by leakage. By this clause the company absolves itself from liability for loss occasioned by theft committed under such circumstances. Surely it is not intended to absolve the company from loss by leakage where the leakage itself is caused by theft. It must relate to theft occurring during or after a leakage and in some manner arising out of the occasion. Otherwise the clause is superfluous and unintelligible; for the policy does not purport to insure against larceny or burglary.

(7) "nor for loss caused directly or indirectly by the neglect of the insured to use all reasonable means at the time of an accident to save and preserve the property;"

This clause requires no comment for the purposes of the case at bar. However, it may not be amiss to observe that the meaning of the word "accident" is somewhat obscure. It probably means an accident to the sprinkler system resulting in leakage.

We have discussed certain clauses which are not directly involved in this controversy. We have done this for the reason that the eight clauses constitute but a single sentence, and it is to be presumed that a continuity of purpose underlies them all and that a principle of interpretation applicable to one should be applicable to all; also to show the difficulty of making a judicial interpretation of this peculiar policy, and to manifest the process of reasoning by which we have arrived at our conclusion.

From our examination of the so-called exceptions, it will be seen that the insurer has not absolved itself from liability for the loss averred in the complaint by unequivocal language. Exemption from that loss is not in the policy by express words nor by necessary implication, and we cannot put it there by way of construction. Men are prompted to pay for in-

surance by the desire to provide indemnity that will be sure and unfailing on the happening of a contingent event; in other words, by the desire to transform an uncertainty into a certainty; or, by the desire to get rid of a hazard, and not by a desire to take on another hazard in the form of an insurance policy. A policy of insurance, therefore, should express the terms of the contract with sufficient clearness that men of average intelligence may know its meaning and should not consist of a series of mysteries. If, in the case at bar, the insurer intended to absolve itself from liability for loss by leakage where the leakage is caused by windstorm, it should have expressed that intention in plain English. Four of the clauses reciting the exceptions contain the words "directly or indirectly," but the other four do not contain them. It must be presumed that the officers of the company were well aware of the important significance of those words, and the fact that they appear in one-half of the exceptions compels us to assume that the omission of them from the other half was deliberate. It is apparent that the insurer might have used language which would have expressed unequivocally the meaning which it now contends should be given the contract, by following consistently throughout the entire paragraph of exceptions the plan of expression evidenced by clause two. If it had done so, the probabilities are that the policy would not have been accepted.

We now come to what may seem to be reasoning by analogy. The obligation in the ordinary fire policy is to pay indemnity "for all direct loss or damage by fire." Where that express obligation is followed by the provision that the insurer "shall not be liable for loss by lightning," nevertheless the insurer is liable for loss by fire where the fire is caused by lightning; but in appraising the loss the actual direct damage by lightning will be excluded. Likewise, where that obligation is fol-

lowed by the provision that the insured "shall not be liable for loss by explosion," nevertheless the insurer is liable for loss by fire where the fire is caused by an antecedent explosion. 1 Clement, Fire Ins. (Title V) 121. The principle underlying these rules is that the destructive agency insured against is designated by the parties themselves as the potential cause of the possible loss for which indemnity is provided; and the courts will not go back of that agency to inquire into the cause of that cause, and will not regard any antecedent agency as the "proximate" cause of the loss, unless compelled to do so by the terms of the contract. *Lynn Gas, etc., Co.* v. *Meriden Fire Ins. Co.* (1893), 158 Mass. 570, 33 N. E. 690, 20 L. R. A. 297, 35 Am. St. 540. In the case at bar the destructive agency is specified in the insurer's obligation as "sprinkler leakage," and there is nothing in the policy which requires us to go back of that agency and inquire into the cause of the leakage or the cause of the storm, or to consider any other antecedent event. This reasoning, therefore, is not by analogy, for the principle is identical throughout.

There is nothing in the policy, which the insurer prepared and handed to the insured, so clearly expressing an intention to except from the general liability 3. of the insurer the risk described in the complaint that we would be justified in holding that by accepting the policy the insured assented to such exception. But if we were in doubt as to this point, then it would be our plain duty to invoke the foregoing rule of construction and to resolve the doubt in favor of the insured.

We hold that the complaint states facts sufficient to constitute a cause of action.

The procedure has been questioned. In 1911 the Code of Civil Procedure was amended in such manner as to provide that the party demurring shall file with

4. the demurrer a memorandum and shall be deemed to have waived his right thereafter to question the pleading for any defect not specified in the memorandum.   §344 Burns 1914, Acts 1911 p. 415. That provision applies where demurrers are addressed to answers and replies.   *Quality Clothes Shop* v. *Keeney* (1915), 57 Ind. App. 500, 106 N. E. 541; *Parker* v. *Hickman* (1916), 61 Ind. App. 152, 111 N. E. 649.   Since the adoption of that amendment the old rule that a demurrer to an answer or reply searches the record, and may be carried back to the complaint, is of doubtful availability.   In the case at bar it is clear that a reversal solely on the ruling on the demurrer to the answer would result merely in another appeal, and therefore we have passed over the question of procedure, and have determined the question which is the source of the entire controversy.

The judgment is reversed, and the trial court is directed to set aside its ruling on the demurrer to the second and third paragraphs of the answer, in its entirety, and then to sustain each demurrer to each paragraph of answer, and to permit further proceedings not inconsistent with this opinion.