**CARVA FOOD CORPORATION,**
Appellant,

v.

**EQUITABLE FIRE AND MARINE INSURANCE COMPANY OF PROVIDENCE, RHODE ISLAND, Defendant and Third-Party Plaintiff, and William B. Dawley, Third-Party Defendant, Appellees.**

**No. 7690.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 15, 1958.

Decided Nov. 12, 1958.

Henry E. Howell, Jr., Norfolk, Va. (Jett, Sykes & Howell, and Bernard Glasser, Norfolk, Va., on brief), for appellant.

Edward L. Breeden, Jr., and Berryman Green, IV, Norfolk, Va. (Breeden, Howard & MacMillan, Norfolk, Va., on brief), for appellees.

Before SOBELOFF, Chief Judge, HAYNSWORTH, Circuit Judge, and BRYAN, District Judge.

HAYNSWORTH, Circuit Judge.

On October 15, 1954 Hurricane Hazel unroofed a building in Norfolk, Virginia, in which Carva Food Corporation had a stock of goods. As the wind tore off the

roof the pipes of a sprinkler system attached to the roof were ruptured, and the escaping water from the broken pipes damaged the stock of goods. Evidently Carva had no hurricane or extended coverage insurance upon the stock of goods, but it did have a sprinkler leakage policy containing a clear and unequivocal provision that loss by sprinkler leakage caused directly, or indirectly, by windstorm was not among the insured perils. Carva does not contend that the insurance policy can be construed to cover the loss sustained, but it sought reformation of the insurance policy to broaden the coverage to include the loss.

The District Judge empaneled an advisory jury, which heard the evidence and, by answers to special interrogatories, found that W. B. Dawley, as Agent for Fireman's Insurance Company, sold a sprinkler leakage policy to Carva in 1942, representing at that time that it would cover any accidental discharge of water from the sprinkler system, except water discharged as a result of fire, that Carva relied upon the representation, that Dawley had the representation in mind when in 1948 he first issued similar coverage as agent for the defendant, Equitable Fire and Marine Insurance Company, and that at the time of subsequent renewals of the coverage in 1948, 1951 and 1954, neither Carva nor Dawley understood that the policy provided no protection for sprinkler leakage damage occasioned by windstorm. The jury also found that all of the loss was caused by the hurricane, and that the facts and circumstances were not sufficient to justify the failure of Carva's officers to read the policies issued in 1942, 1945, 1948, 1951 and 1954 and to inform themselves of the actual coverage.

The District Judge "disagreeing with the conclusions of the jury, but ever mindful of the weight to be attached to such findings," entered judgment for the defendant upon the ground, among others, that the testimony was insufficient to show such a mutual mistake as would warrant a reformation of the policy.

In an affidavit executed after the loss, Mr. Clyde F. Hill, one of Carva's officers, stated:

"About the year 1942 Mr. W. B. Dawley discussed with me the advisability of purchasing a sprinkler leakage policy as Carva Food Corporation had recently moved into a building designated as 1107 Louisa Street, Norfolk, Virginia. As we were storing and have ever since stored perishable goods in said building, I told Mr. Dawley we would be interested in purchasing a policy which would cover the stock from damage by reason of water coming from within the sprinkler system. Of course, I did not expect the policy to cover water that came out of the system by reason of a fire, but I did intend to be covered under all other circumstances."

\* \* \* \* \* \*

"I relied upon the representation of Mr. Dawley that the sprinkler leakage policy which he sold to Carva Food Corporation would fully cover all damages to our stock by reason of water coming from the sprinkler system, except in case of fire, and purchased no other insurance to cover water damage loss to our stock by reason of water coming from the sprinkler system."

Mr. Hill died before the trial and the District Court excluded his affidavit, so what was done and said in 1942 was dependent upon the testimony of the insurance agent, Dawley, who had been joined as a third-party defendant. In a discovery deposition taken before he was brought in as a third-party defendant, Dawley had testified:

"Q. Now, Mr. Dawley, there were no conditions placed upon the type of sprinkler leakage policy that Mr. Hill wanted or that you suggested that he buy and which he did buy? A. Of course, we have to sell the standard form.

"Q. But you suggested that he should be covered for damage from water coming within the sprinkler

system other than when it is used for putting out a fire? A. I think that is a fair statement, yes.

"Q. And Mr. Hill, on behalf of Carva Food, purchased such policy? A. Right.

\* \* \* \* \* \*

"Q. Is there any substantial question in your mind that whomever you dealt with at Carva Food, you suggested that they buy a sprinkler leakage policy and they bought one? A. No, there is no doubt about that.

\* \* \* \* \* \*

"Q. Now, Mr. Dawley, when the loss occurred on October 15, 1954, at Carva Food; that is, the water damage to the stock of goods stored in the Carva Food warehouse; when that damage occurred, were you not of the opinion that Carva Food Corporation was covered for any damage to the goods resulting from water coming from within the sprinkler leakage system so long as there had not been a fire? A. I was.

"Q. And did you not so inform Carva Food that they were covered for the loss that occurred on October 15, 1954? A. I did.

\* \* \* \* \* \*

"Q. You would explain to him why he needed it. Is it not true, Sir, that you have testified that what you would explain to him is that he needed coverage for any discharge of water from the sprinkler leakage system that was caused by an accident, any accidental cause? A. Accidental discharge.

"Q. And you made that representation to Mr. Hill? A. That is my memory on it.

\* \* \* \* \* \*

"Q. But you suggested that he should be covered for damage from water coming within the sprinkler system other than when it is used for putting out a fire? A. I think that is a fair statement, yes.

"Q. And Mr. Hill, on behalf of Carva Food, purchased such policy? A. Right."

At the time of the trial, Mr. Dawley's testimony was taken, during the course of which the following answers were elicited:

"A. Well, the chances are I suggested it to him; but you are asking me to recall something about ten or twelve years ago and I can't be that specific.

"Q. Now, Mr. Dawley, there were no conditions placed upon the type of sprinkler leakage policy that Mr. Hill wanted or that you suggested that he buy and which he did buy? A. Of course, we have to sell the standard form.

\* \* \* \* \* \*

"Q. And there is no doubt in your mind that there were no conditions placed upon the sprinkler leakage policy at the time you sold it? A. Except those that are printed in the policy, which we have no control over.

\* \* \* \* \* \*

"Q. And when you went around to his office in 1942, you suggested to him that the company ought to have this sprinkler leakage coverage, didn't you? A. Mr. Howell, I have previously testified that all of the testimony that I have given today and in previous days on this case has been based upon my memory and over a period of fifteen years, you are asking too much. I just can't do it.

"Q. I understand that, Mr. Dawley, but we have been over this before and each time I ask it we have to go back and refresh your recollection. But is there any question in your mind that you represented to Carva that they ought to have a sprinkler leakage policy that would cover them for all accidental discharge of water and that that statement of an offer to sell a contract of insurance for that type of coverage was made to Mr. Clyde Hill, Sr., when he was alive? A. I will only have to state again, I have testified in this case today and in other

days on the basis of my memory and I just can't recall.

\*　　\*　　\*　　\*　　\*　　\*

"Q. Let me ask you that: There is no doubt in your mind that you sold them a contract of insurance for the purpose of covering them for all accidental discharge from water sprinkler? No question in your mind about having made that sale of contract of insurance? A. I sold a sprinkler leakage policy subject to the standard conditions. I can't sell a policy any differently."

Before considering the sufficiency of the evidence to justify a reformation of the insurance policy, it is appropriate to advert to the essential purpose of sprinkler leakage insurance.

When automatic sprinkler systems were developed and their use was encouraged by the extension of more favorable fire insurance rates, a new peril was created. The installation of such a system substantially diminished the risk of loss from fire, but it created a new water hazard, for freezing water in the systems, heat short of fire, corrosion and other occurrences could cause a discharge of water within a building and upon its contents. This entirely new risk occasioned the need for a new type of insurance, which the sprinkler leakage coverage was designed to meet. Carva had, in fact, sprinkler leakage caused by such occurrences, and it received payment from the insurer of claims for the resulting losses.

■ One would not suppose that insurers or the public ever conceived of sprinkler leakage insurance as being in substitution for the traditional forms of insurance against natural perils with which mankind has always contended. It is elementary that windstorm and extended coverage insurance cover all loss resulting proximately from any occurrence within the coverage. Water damage from a sprinkler system is certainly a proximate result of the windstorm which tears off a roof and ruptures the pipes. Indeed, many windstorm and extended coverage policies expressly provide that they cover loss caused by water from a sprinkler system ruptured by the damaging wind. See, for instance, the terms of the policies considered by the courts in Loyola University v. Sun Underwriters Ins. Co. of New York, D.C. E.D.La., 93 F.Supp. 186 and Camden Fire Ins. Ass'n v. New Buena Vista Hotel Co., 199 Miss. 585, 24 So.2d 848, 26 So.2d 174. The charged sprinkler system was the instrumentality through which the destructive effect of the force of the wind was extended, but what occurred was essentially the result of the windstorm peril and would have been collectible under windstorm insurance had it been provided.

Some earlier forms of sprinkler leakage insurance were held to cover discharges from the system when the pipes were broken by windstorm. Maxwell v. Springfield Fire & Marine Ins. Co., 73 Ind.App. 251, 125 N.E. 645; American Paper Products Co. v. Continental Ins. Co., 208 Mo.App. 87, 225 S.W. 1029; Hanover Fire Ins. Co. v. Newman's, Inc., 5 Cir., 108 F.2d 561. Generally in those cases, contrasting language in the policy led the courts to apply the strict construction rule and to construe an exception of loss from windstorm as not excluding damage from sprinkler leakage, even though the malfunctioning of the sprinkler system was caused directly by windstorm. Doubtless such decisions occasioned subsequent changes in policy forms, and more recent decisions have held that sprinkler leakage insurance does not cover loss from the discharge of water from the sprinkler system when the discharge is caused by windstorm. Industrial Paper & Cordage Company v. Aetna Insurance Company, 65 R.I. 357, 14 A.2d 657, 130 A.L.R. 703; Woogmaster v. Liverpool & London & Globe Ins. Co., Ltd., 312 Mass. 479, 45 N.E.2d 394; American Mfg. Corporation, Inc., v. National Union Fire Ins. Co. of Pittsburg, Pa., 203 La. 515, 14 So.2d 430; Hardin Bag & Burlap Co., Inc., v. Fidelity & Guaranty Fire Corporation of Baltimore, 203 La. 778, 14 So. 2d 634.

■■ We now turn to the evidentiary basis for reformation of this insurance policy. It is clear that Mr. Dawley expressed the opinion after the loss that he believed the loss was covered under the sprinkler leakage policy, though how he, an insurance counselor, could have been of that opinion in the light of the clear language of the policy does not appear. He acted as Carva's insurance counselor, selling Carva and a related company many different kinds of insurance, and it is suggested that Carva was one of his most valued clients which he was anxious to protect. Why Carva had no extended coverage or windstorm insurance upon the contents of the building does not appear, but if Dawley felt, in any degree, a sense of responsibility for the omission, he, in the interest of his valued client, may naturally have strained to find the protection in some insurance which was in effect. Mr. Dawley's opinion, after the loss, of course, is not binding upon the insurance company. Bankers Fire Ins. Co. v. Henderson, 196 Va. 195, 83 S.E.2d 424.

The testimony of what occurred in 1942 when sprinkler leakage coverage was first taken by Carva through Dawley, and in 1948 when that insurance was first placed with the Equitable Fire & Marine Insurance Company is manifestly unsatisfactory. Clearly, neither Dawley nor the officer of Carva, with whom he may have dealt, consciously thought in terms of discharges from the sprinkler system occasioned by windstorm. Perhaps, though it is by no means clear from Dawley's uncertain recollection, he referred generally to the insurance as providing protection against accidental discharges from the sprinkler system, a statement which is descriptive of the purpose of the sprinkler leakage policy, though it does not necessarily mean that such coverage is a duplication of, or in substitution for, other traditional forms of insurance against the perils of fire and windstorm. There is certainly no positive or emphatic showing that in 1942 Mr. Dawley intended to place, and have

Carva pay for, protection against windstorm, explosion and other extended coverage risks, merely because the sprinkler system may have been a possible means through which a portion of the damage resulting from exposure to those risks might be inflicted. Moreover, there is nothing whatever upon which to base a finding that in 1948 when Dawley first placed this coverage with Equitable Fire & Marine Insurance Corporation he had consciously in his mind any representation or statement that may have been made in 1942.

■ The clear and unequivocal terms of the written insurance policy is presumed to be the true agreement of the parties. State Farm Mutual Automobile Ins. Co. v. Miller, 194 Va. 589, 74 S.E.2d 145. That is not to say that a court of equity cannot, if fraud or a clear case of mistake of fact is made to appear, reform the instrument, but to do so, the mutual mistake must be proved "by evidence plain and convincing and beyond a reasonable doubt." Maryland Casualty Company v. Morris Oil Corporation, 4 Cir., 233 F.2d 291, 293; State Farm Mutual Automobile Ins. Co. v. Miller, 194 Va. 589, 74 S.E.2d 145; Newport News Shipbuilding & Dry Dock Co. v. Isherwood, 4 Cir., 5 F.2d 924; Bankers Fire Ins. Co. v. Henderson, 196 Va. 195, 83 S.E.2d 424; Temple v. Virginia Auto Mutual Ins. Co., 181 Va. 561, 25 S.E.2d 268.

Granting full weight to Mr. Dawley's opinion, after the loss, that protection was extended under this policy, the evidence clearly is not so plain and convincing as to produce a conviction beyond a reasonable doubt that a mistake was made in 1942 or in 1948 in the issuance of this insurance. If any mistake was made, it was in the failure to issue other insurance and not in the content of this particular policy.

Great reliance is placed by Carva upon the decision in this Court in Maryland Casualty Company v. Morris Oil Corporation, supra, in which it appeared by clear and convincing testimony that

the insured had asked for coverage of a type which was issued by the insurance company through its agent, but that by mistake a different form of policy was issued and accepted. The testimony here has no such force as that in the Morris Oil case.

The situation in the Morris Oil Corporation case leads here to another argument, for the applicable provisions of Equitable's sprinkler leakage policies in use in 1942 were not the same as those in use in 1954. If we assume that the Fireman's policy actually issued in 1942 contained the same provisions as the then current Equitable form, the argument goes that Dawley should have called to Carva's attention the change in the provision rather than representing each new policy as being a renewal of the former coverage. Regardless of what other infirmities there may be in the argument, it depends upon the assumption that the language of the form current in 1942 would clearly cover the loss. As indicated earlier, however, such language is not readily susceptible to the construction that Carva would have us place upon it. The 1942 form excluded "loss or damages caused directly or indirectly * * * by fire, lightning, cyclone, tornado, windstorm, earthquake, explosion * * *." There is no contrasting phraseology which would point to any significance in the fact that the excluded loss was not affirmatively stated to be by sprinkler leakage resulting from the excluded hazards. The policy purported affirmatively to cover only losses to the goods resulting from an accidental discharge of the sprinkler system. It did not insure the system itself, and there would be no reason whatever to exclude losses by fire and the other excluded hazards unless it were intended to exclude losses by reason of sprinkler system discharges caused by the excluded hazards. This seems particularly true, when the excluded hazards are those for which protection is readily available in commonly known insurance forms having a much longer history than the sprinkler leakage coverage. In-

deed, the exact language of the 1942 Equitable form was before the Rhode Island Supreme Court in Industrial Paper & Cordage Company v. Aetna Insurance Company, 65 R.I. 357, 14 A.2d 657, 130 A.L.R. 703. See also Woogmaster v. Liverpool & London & Globe Ins. Co., Ltd., 312 Mass. 479, 45 N.E.2d 394; American Mfg. Corporation, Inc., v. National Union Fire Ins. Co. of Pittsburg, Pa., 203 La. 515, 14 So.2d 430; Hardin Bag & Burlap Co., Inc., v. Fidelity & Guaranty Fire Corporation of Baltimore, 203 La. 778, 14 So.2d 634.

Even if, under the rule of strict construction against the insurance company, the effect of the language in use in the 1942 form might be thought debatable, it does not follow that the change in phraseology constituted a change in the true intention of both of the parties. Whatever duty might be cast upon an agent, when renewing expiring policies, to inform the insured of basic change in the protection provided, there is no requirement that he point out every formal change and linguistic revision. No more can be said of the revision in the language here than that it was adopted by the insurance company in an effort to avoid controversy and to express its true intention with even greater clarity. Quite unlike the situation in the Morris Oil case, it nowhere appears that Equitable had ever been willing to assume in its sprinkler leakage policies portions of the extended coverage risks, and it can be charged with no breach of duty in failing to direct the attention of the policyholder to a linguistic revision by which it re-expressed its unchanging intention.

It appears that no official of Carva ever read any of these policies, though they had losses within the coverage of the policies, had filed claims and received payment for the losses they sustained. In view of our conclusion, however, that the District Judge was correct in finding that the testimony does not warrant reformation, we need not consider the effect of the jury's verdict that the cir-

cumstances were insufficient to excuse Carva's failure to examine the policies or other defenses and objections advanced by the insurance company.

Affirmed.